# EXHIBIT A

HUESTON HENNIGAN LLP
John C. Hueston, State Bar No. 164921
jhueston@hueston.com
Robert N. Klieger, State Bar No. 192962
rklieger@hueston.com
Craig A. Fligor, State Bar No. 323174
cfligor@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:    (213) 788-4340
Facsimile:     (888) 775-0898

Attorneys for Plaintiff
Intrivo Diagnostics, Inc.

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| INTRIVO DIAGNOSTICS, INC., a Delaware corporation, <br><br> Plaintiff, <br><br> vs. <br><br> ACCESS BIO, INC., a New Jersey corporation, and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.   22STCV01975 <br><br> **COMPLAINT FOR:** <br><br> **(1)   BREACH OF CONTRACT** <br> **(2)   BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;** <br> **(3)   PROMISSORY FRAUD;** <br> **(4)   INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;** <br> **(5)   INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** <br> **(6)   UNLAWFUL BUSINESS PRACTICES** <br><br> **<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Intrivo Diagnostics, Inc. ("Intrivo"), for its complaint against Defendant Access Bio, Inc. ("Access Bio") and Does 1 through 10, inclusive, alleges as follows:

**INTRODUCTION**

1. The COVID-19 pandemic represents one of the greatest public health challenges of our lifetime. For over two years, governments, businesses, non-profit organizations, families, and individuals have implemented and abided by numerous protocols, requirements, and guidelines designed to mitigate the public health risks and reduce the spread of COVID-19.  While three vaccines have now been authorized or approved in the U.S., accurate testing has been, and remains, essential to controlling the pandemic and saving lives. Testing not only facilitates early treatment but, more importantly, enables infected individuals, many of whom have few if any symptoms, to isolate themselves before infecting others.

2. Plaintiff Intrivo has been at the forefront of the efforts to develop and deploy rapid, accurate, and easy-to-use COVID-19 tests. Intrivo is the co-producer and exclusive distributor of the On/Go Rapid COVID-19 Antigen Self-Test (the "On/Go Test"), a reliable and affordable over-the-counter ("OTC"), self-administered rapid antigen test that delivers results in just 10 minutes. Independent health and safety groups have rated the On/Go Test best-in-class for accuracy and ease of use, in large part due to Intrivo's proprietary and FDA-authorized consumer application that instructs users to properly administer and interpret the test results. The On/Go app is ranked #1 on the iPhone App Store and #2 on the Google Play Store among healthcare apps.

3. Over the last two years, Intrivo has built the most efficient distribution network of any COVID-19 test manufacturer or distributor. Intrivo has entered into government, retail, and enterprise contracts to deliver tens of millions of On/Go Tests to, among others, the State of California and the U.S. Department of Defense, for use in schools, hospitals, nursing homes, businesses, and community testing sites throughout the United States. Intrivo has also established a robust direct-to-consumer distribution network for the On/Go Tests, with ordering available on Amazon.com., Walmart.com, LetsOnGo.com, and Gopuff, an instant-delivery service that can deliver tests within just 15–20 minutes to homes in more than 1,000 U.S. cities. Intrivo's tests are in high demand, with Intrivo's outstanding orders for rapid tests totaling over $1.1 billion.

4.      Intrivo cannot deliver the COVID-19 rapid tests that are so vital to curbing the latest wave of the pandemic unless it has sufficient quantities of the tests on hand. Intrivo is therefore highly dependent on the manufacturer of the tests to produce them in the needed (and agreed-upon) quantities. Intrivo did not leave that to chance. Early in the pandemic, Intrivo partnered with Access Bio, then a struggling diagnostics company best known for its malaria tests, to develop and distribute rapid tests for COVID-19. In exchange for a grant of exclusive U.S. distribution rights, Intrivo invested many millions of dollars and devoted virtually all of its resources in support of its partnership with Access Bio. Among other things: Intrivo prepaid for millions of tests so that Access Bio could meet its payroll obligations and build production capacity; Intrivo assisted Access Bio in the design, negotiation, and funding of numerous clinical studies required for multiple FDA Emergency Use Authorizations ("EUAs"); Intrivo hired regulatory and compliance consultants to assist in obtaining the EUAs; and Intrivo located and negotiated leases for additional production sites. Intrivo did all of this while at the same time developing its best-in-class mobile application and building out an unmatched distribution network. For its part, Access Bio needed only manufacture and sell the tests, once authorized, to Intrivo at a pre-negotiated price so that Intrivo could distribute the tests and save lives.

5.      In early October 2021, shortly after the FDA granted an EUA for the On/Go Test, Intrivo and Access Bio entered into a binding term sheet (the "Supply Contract") in which Access Bio committed to produce and deliver no fewer than 53.6 million On/Go Tests by the end of 2021, and to continue thereafter to devote no less than 65% of its production capacity for antigen tests to the On/Go Tests for the entire four-year term of the contract.

6.      Access Bio reneged on its contractual promises from the start. Instead of shipping 16.1 million On/Go Tests to Intrivo in October, as Access Bio had committed to do in the Supply Contract, it delivered less than 2.3 million tests. Instead of 16.5 million tests in November, Access Bio delivered only about 4.6 million tests. Access Bio assured Intrivo it was doing its very best and offered various excuses for the delivery shortfalls, including inadequate production capacity, labor constraints, and shortages of raw materials. Intrivo stepped up to address each purported issue, including by engaging third-party manufacturers to package the tests and onboarding additional

staff. Still, the backlog continued to grow. By the end of the year, Access Bio had delivered only about 21.6 million of the promised 53.6 million tests—a shortfall of approximately 32 million tests.

7.      It was not until early January 2022 that Intrivo learned the true reason for this gross shortfall. Access Bio had the required production capacity, it had the necessary staffing, and it had an adequate supply of raw materials. However, instead of dedicating those resources to producing On/Go Tests for Intrivo, Access Bio was diverting them in significant part to the production of virtually identical OTC tests that Access Bio could sell itself, under its own "CareStart" brand, at a higher price point than it had negotiated with Intrivo. Rather than perform the Supply Contract in good faith, Access Bio's executives turned their backs on Intrivo—without whose extraordinary dedication of time and resources Access Bio could never have developed and obtained EUA authorization for the tests in the first place—and sought to line their own pockets and those of their investors with the fruits of Intrivo's efforts. As a result, Intrivo has received only a fraction of the tests on which the State of California, U.S. Department of Defense, retail and enterprise customers, and consumers have been waiting. Worse yet, because Access Bio lacks an effective domestic distribution network, many of its CareStart tests are being shipped overseas or sitting in warehouses and reaching consumers only after they have expired, if at all. Access Bio's greed is costing lives.

8.      In early January 2022, Intrivo confronted Access Bio and demanded that it adhere to the Supply Contract. Access Bio's response was nothing short of stunning. Rather than agree to cure its delivery shortfall and otherwise comply with the Supply Contract, Access Bio told Intrivo last Thursday, January 13 that it would stop delivering tests *altogether* unless Intrivo agreed by 5:00 p.m. the next day to waive its entitlement to the past-due tests, release Access Bio of all liability, and make a series of other concessions. To the extent Access Bio gave any thought at all to the devastating public health implications of its ultimatum, they simply were not its concern.

9.      Intrivo brings this action to enforce Access Bio's obligations under the Supply Contract, to recover damages for Access Bio's breaches of the Supply Contract and the parties' License Term Sheet dated October 6, 2021, and to recover damages for the false promises that

1  Access Bio made to induce Intrivo to enter into those agreements and the Payment Agreement and

2  Amendment No. 2 to Supply and Distribution Agreement of that same date.[1]

3  **PARTIES**

4  10.  Plaintiff Intrivo Diagnostics, Inc. is a Delaware corporation with its corporate

5  offices in Culver City, California.

6  11.  Defendant Access Bio, Inc. is a New Jersey corporation with a principal place of

7  business in Somerset, New Jersey. Access Bio is a public company traded on the KOSDAQ

8  (Korean Stock Exchange) that manufactures diagnostic tests and has a current market capitalization

9  of approximately $500 million.

10  12.  The true names and capacities of the defendants named herein as Does 1 through 10,

11  inclusive, whether individual, corporate, or otherwise, are currently unknown to Intrivo, which

12  therefore sues such defendants by fictitious names pursuant to section 474 of the Code of Civil

13  Procedure.  Intrivo is informed and believes, and based thereon alleges, that each of the fictitiously

14  named defendants is responsible in some manner for the occurrences alleged herein, and that the

15  damages as alleged herein were proximately caused by their conduct.  Intrivo will amend this

16  Complaint to identify the true names and capacities of each of the fictitiously named defendants

17  when such names and capacities have been determined.

18  **JURISDICTION AND VENUE**

19  13.  This Court has jurisdiction over all parties pursuant to California Code of Civil

20  Procedure section 410.10.

21  14.  This Court may exercise specific personal jurisdiction over Access Bio because

22  Intrivo's claims arise out of or relate to Access Bio's suit-related conduct that creates a substantial

23  connection to California. Access Bio purposefully availed itself of the benefits of this forum by,

24  among other things:

25

26  _____

27  [1] Intrivo will be initiating an arbitration action pursuant to the Supply and Distribution Agreement
   dated May 2020, as amended, to enjoin and recover damages for Access Bio's sales of CareStart

28  point-of-care tests for distribution in the U.S. in violation of Intrivo's exclusive distribution rights.

- Access Bio and its representatives placed telephone calls and sent email correspondence to Intrivo at its corporate offices in California in connection with the negotiation of the Supply Contract, License Term Sheet ("License Agreement"), and Payment Agreement that are the subject of this dispute;

- Access Bio has engaged in near daily telephone calls and electronic communications with employees of Intrivo located in California in connection with the performance of the Supply Contract and License Term Sheet;

- Access Bio relied on clinical studies that Intrivo managed from California, including studies that were conducted in California, to obtain FDA EUA for the COVID-19 tests that are covered by the Supply Contract;

- Access Bio's Chairman, Choi Young, visited Intrivo's California offices on several occasions in furtherance of the parties' business relationship;

- Access Bio sold millions of COVID-19 tests to Intrivo for distribution in California, including several large orders to the State of California;

- Intrivo employees based in its California offices oversaw and directed the development of the On/Go mobile application that Access Bio licensed from Intrivo pursuant to the License Agreement;

- Access Bio directed a number of its fraudulent misrepresentations to employees of Intrivo located in California; and

- Access Bio intended to cause, and did cause, Intrivo to suffer substantial injury in California.

Access Bio's contacts with California were not random, fortuitous, or attenuated, but were instead part of a continuous course of conduct by which Access Bio derived significant benefits. It is therefore fair to require Access Bio to defend itself in California in this controversy arising out of that course of conduct.

15. Venue is proper in this Court pursuant to California Code of Procedure § 395(a) because Access Bio does not reside in this state.

**FACTUAL BACKGROUND**

A.      **Intrivo Partners With Access Bio On COVID-19 Testing Solutions**

16.      Intrivo is a digital health technology company that combines, science, technology, and user-centered designs to tackle health challenges and help individuals live happier, healthier, and safer lives. From the onset of the COVID-19 pandemic, Intrivo has dedicated itself to protecting the health and welfare of individuals residing in California and across the country against the spread of the coronavirus and assisting federal, state, and local governments and companies to safely reopen the economy. It did so by taking a leading role in the development of rapid antigen tests to detect the virus and the establishment of a world-class distribution network to ensure that the tests, once authorized, could be quickly and efficiently delivered to those who need them most.

17.      When the pandemic hit, Access Bio was a struggling medical diagnostic test manufacturing company best known for a malaria test that it sold overseas.  None of Access Bio's testing products had been authorized or approved by the FDA for sale in the U.S. before 2020. As a result, Access Bio had no domestic marketing or distribution network capable of supporting the domestic distribution and sale of testing products, much less on the scale that would be required for COVID-19 rapid tests. Access Bio was also struggling financially and, on information and belief, had lost $19 million in 2019.

18.      Intrivo anticipated a significant need for testing that would be borne out early in the pandemic, and committed to use its healthcare technology, distribution expertise, and financial resources to oversee and guide Access Bio's development and production of COVID-19 rapid tests, which Intrivo could then commercialize by building out an unmatched distribution network capable of delivering the tests quickly and efficiently to government organizations, businesses, and individuals in California and across the country.

19.      On May 29, 2020, Intrivo and Access Bio entered into a Supply and Distribution Agreement pursuant to which Intrivo would have the exclusive right to distribute the COVID-19 tests then under development by Access Bio. Intrivo invested millions of dollars, and untold time and energy, in support of Access Bio, including by:

- prepaying millions of dollars so that Access Bio could meet payroll obligations and increase its production capacity;

- paying for manufacturing and compliance consultants for Access Bio;

- paying for regulatory consultants to assist Access Bio in obtaining multiple FDA EUAs;

- locating and negotiating leases for additional production sites for Access Bio;

- paying to overhaul Access Bio's brand, including the creation of a new brand, logo, and identity for Access Bio's "CareStart" product line, and rebuilding Access Bio's website;

- assisting Access Bio in the design, negotiation, and funding of numerous studies required for Access Bio's tests to receive FDA EUA; and

- hiring dozens of personnel to accommodate the commercialization needs of Access Bio's COVID-19 tests.

Intrivo did all of this while at the same time investing heavily to build out a world-class distribution network that would make the tests readily accessible throughout California and across the country.

20. In August 2020, in return for Intrivo's continued monetary and nonmonetary support, Intrivo and Access Bio entered into Amendment No. 1 to the Supply and Distribution Agreement. Among other things, that amendment afforded Intrivo exclusive U.S. distribution rights for all of Access Bio's rapid COVID-19 antigen tests through May 29, 2025. The amendment also afforded Intrivo exclusive U.S. distribution rights for any newly developed COVID-19 related tests for which Intrivo funded certain development costs.

**B. Access Bio Repeatedly Breaches The Supply And Distribution Agreement**

21. At the time the Supply and Distribution Agreement and amendment were signed, there were no plans to have different point-of-care ("POC") and over-the-counter ("OTC") tests. However, in an effort to speed up the FDA's EUA process, a decision was made to bifurcate the products and seek authorization for the POC version first. That authorization was obtained in October 2020, and Intrivo thereafter began distributing the CareStart COVID-19 Antigen POC test (the "CareStart POC Test") throughout the United States.

22.     Under the Supply and Distribution Agreement, Intrivo's U.S. distribution rights in the CareStart POC Test were *exclusive*. Yet, almost from the start, Access Bio violated that exclusivity by selling CareStart POC Tests to other distributors for domestic distribution. Those distributors included Areum Bio, LLC and Rodimedi & Associates, Inc., each of which received Letters of Authorization signed by Access Bio Chairman Young Choi authorizing them to distribute the CareStart POC Tests within the U.S., in direct contravention of Intrivo's exclusivity rights.

23.     In June 2021, while awaiting the impending issuance of an EUA for Access Bio's OTC test (the "CareStart OTC Test"), Access Bio began asserting that the Supply and Distribution Agreement did not afford Intrivo *any* exclusive distribution rights in that test, and that its exclusivity was instead limited to the CareStart POC Tests (which Access Bio nonetheless continued to violate). Access Bio also insisted that Intrivo was obligated to remit $140 million to Access Bio in connection with its purchase of 20 million of the CareStart POC Tests, despite having repeatedly advised Intrivo that the true price would be less than half that amount and would be netted against future sales of the OTC test.

24.     Access Bio's bad faith continued after the OTC test received its EUA in August 2021. CVS Pharmacy terminated negotiations to purchase millions of OTC tests from Intrivo when Access Bio refused to confirm Intrivo's exclusive distribution rights. That same month, one of Intrivo's subdistributors, The Mega Company, abruptly terminated negotiations on a major contract with Anthem, Inc., when Access Bio again refused to confirm Intrivo's exclusivity. Access Bio further misused Intrivo's confidential customer list, which Intrivo had been required to disclose to Access Bio as part of its FDA submissions, to solicit other U.S. distributors for the OTC tests, again in direct contravention of Intrivo's exclusivity rights.

25.     On July 23, 2021, Intrivo and Access Bio agreed on a framework to resolve the exclusivity dispute and other issues between the parties. Intrivo agreed to relinquish its exclusivity over the CareStart OTC Test and to license its software platform to Access Bio for use in connection with that test. In exchange, Access Bio agreed to manufacture a white-label version of

the CareStart OTC Test under Intrivo's On/Go brand, with quantities, pricing, and terms to be mutually agreed upon in subsequent negotiations.

26.     Notwithstanding this agreement on a framework, the relationship between the parties worsened, with Access Bio continuing to undermine Intrivo's business relationships. Access Bio refused Intrivo's demands that it cease and desist from this brazen misconduct, prompting Intrivo to begin preparing to take legal action. Knowing that its positions could not withstand legal scrutiny, Access Bio resorted to strong-arm tactics, informing Intrivo that it would cease providing *any* tests to Intrivo unless Intrivo formally waived its exclusive distribution rights and released Access Bio from liability for all of its wrongful conduct to date. Intrivo's customers would then be left without the tests that were so vital to curbing the COVID-19 pandemic, and Intrivo would in all likelihood have been driven out of business. Although Intrivo was not willing simply to capitulate, it reluctantly agreed to renegotiate its arrangement with Access Bio under clear commercial duress.

**C.     The October 2021 Agreements**

27.     In September and early October 2021, Intrivo and Access Bio hashed out the terms of their business relationship going forward. The essential terms were as follows:

- Intrivo would waive its exclusive distribution rights as to all products other than the CareStart POC Test, and limited its exclusive territory even as to that test;

- Access Bio would produce and deliver to Intrivo no fewer than 53.6 million On/Go Tests by December 31, 2021, a figure far lower than Intrivo requested, but one Access Bio assured Intrivo it could meet;

- Access Bio would devote 65% of its total antigen test production capacity to the manufacture of On/Go Tests for Intrivo for the next four years;

- Access Bio would pay Intrivo a license fee of $0.50 per test for each CareStart OTC Test that Access Bio distributed in the U.S.;

- Intrivo would pay more than $120 million to Access Bio in installments over the following 13 months; and

- Intrivo would release all claims against Access Bio for any and all past misconduct, whether or not known to Intrivo.

28.     These arrangements were memorialized in a series of three agreements dated October 6, 2021, two of which are at issue in this action and the third of which will be the subject of a separate arbitration proceeding. Under the first agreement, the Supply Contract, Access Bio committed to allocate for production and delivery to Intrivo "no less than the following number of [On/Go] OTC Tests":

> "Ready to Ship:  400,000 tests
>
> By October 20:  1,400,000 tests
>
> October:  14,300,000 tests (in addition to the above number of tests)
>
> November:  16,500,000 tests
>
> December:  21,000,000 tests."

In addition to these guaranteed minimums for the first several months of the Supply Contract, Access Bio committed to dedicate "65% of Access Bio's production of antigen tests (POC and OTC)" to On/Go Tests for the entire four-year term of the Supply Contract, as well as to negotiate in good faith with Intrivo on a quarterly basis to agree upon minimum allocations for months after those set forth above.

29.     The second agreement, the License Agreement, afforded Access Bio a license to use Intrivo's proprietary mobile application in connection with its CareStart OTC Tests. In exchange for that license, Access Bio committed to pay Intrivo a license fee of $0.50 per CareStart OTC Test that it distributes in the U.S. (and outside the U.S. as agreed on a case-by-case basis).

30.     The third agreement was a Payment Agreement and Amendment No. 2 to Supply and Distribution Agreement. That agreement set forth Intrivo's obligation to remit more than $120 million to Access Bio in monthly installments (an obligation with which Intrivo has scrupulously complied), amended the Supply and Distribution Agreement to eliminate Intrivo's exclusive U.S. distribution rights as to all products other than the CareStart POC Tests, and waived and released any and all claims between the parties. Intrivo would not have entered into the Payment Agreement and Amendment No. 2 to Supply and Distribution Agreement or agreed to any of its terms but for Access Bio's commitments in the Supply Contract and License Agreement.

**D.     Access Bio Breaches The Supply Contract And License Agreement**

31.     Access Bio materially breached the Supply Contract from the start, missing the first and every subsequent minimum deliverable to which it had committed. Access Bio did not deliver 16.1 million On/Go Tests to Intrivo in October, but instead delivered only 2,292,480 tests. Access Bio did not deliver 16.5 million On/Go Tests in November, but instead delivered only 4,634,406 tests. And Access Bio did not deliver 21 million On/Go Tests in December, but instead delivered only 14,666,160 tests. Thus, by the end of December, Access Bio had delivered approximately 32 million *fewer* On/Go Tests than the minimum guarantees.[2]

32.     For much of October through December, Access Bio appeared to be laying the foundation for an impracticability defense, blaming the mounting shortfalls on factors purportedly beyond its control, including an inadequate supply of raw materials and labor shortages. Intrivo regularly advised Access Bio of the government and enterprise contracts that it had committed to but was unable to fulfill, and still other prospective contracts that it was unable to conclude, as a direct result of Access Bio's delivery failures. Access Bio repeatedly assured Intrivo that it was doing its absolute best to satisfy the minimum guarantees, and Intrivo did everything it could to assist Access Bio in meeting the supposed challenges to its production capacity.

33.     It was not until the turn of the year that Intrivo discovered the real reason that Access Bio had fallen so short of the minimum guarantees: Rather than dedicate its production capacity to the On/Go Tests in order to meet the minimum guarantees, Access Bio had, from the start, been secretly diverting significant resources to the production of its own antigen tests that Access Bio could sell at a higher price point for its own account. In other words, Access Bio's breaches were not explained by labor shortages or an inadequate supply of raw materials, but instead by Access Bio's failure to dedicate the resources it *does* have to satisfy the minimum guarantees.

---

[2] During the first half of January 2022, Access Bio delivered an additional 7,362,586 tests, thus reducing the shortfall for 2021 to 24,644,368 On/Go Tests. Even including the late-delivered January tests, that is barely one-half of the minimum guaranteed deliverables.

34.     As recently as last week, Gopuff, an on-demand delivery service capable of delivering tests to individuals in more than 1,000 cities nationwide in just 15-20 minutes, informed Intrivo that even though its "customers prefer On/Go tests over any other," Intrivo's inability to fulfill its purchase orders had forced the company to switch to Access Bio's CareStart OTC Test— a test that Access Bio should not even have been producing unless and until it had satisfied the minimum guarantees in the Supply Contract. On information and belief, Access Bio has produced millions of CareStart OTC Tests since October 2020 in flagrant breach of the Supply Contract, which unequivocally requires prioritization of On/Go Test production until the minimum guarantees are satisfied. Worse yet, because Access Bio lacks an effective distribution network, many of those CareStart OTC Tests are being exported out of the country or delayed in reaching consumers. And, in those instances where the CareStart OTC Tests are reaching consumers, Access Bio has not remitted to Intrivo a single penny of the license fees that it is required to pay to Intrivo in connection with those sales.

35.     Access Bio's flagrant actions have caused and will continue to cause serious and irreparable harm to both the general public and Intrivo. Intrivo has over $1.1 billion in On/Go Test orders, many of which have been delayed due to Access Bio's nonperformance under the Supply Contract. A number of Intrivo's customers have canceled contracts to purchase On/Go Tests or terminated their relationship with Intrivo entirely as a result of delivery delays. One such customer is the California Department of Public Health, which recently canceled an order for 3.5 million On/Go Tests intended for distribution to at-risk communities because of delivery delays caused by Access Bio's intentional delivery shortfalls. Other impacted customers include the U.S. Department of Defense, large companies, retailers, insurers, defense contractors, and millions of everyday consumers who purchased On/Go Tests on e-commerce websites including Amazon.com, Walmart.com, and LetsOnGo.com but have yet to receive their orders. Moreover, Intrivo has been unable to commit to new orders because of Access Bio's intentional delivery shortfalls. All told, Intrivo is suffering hundreds of millions of dollars in lost sales and irreparable harm to its reputation.

**E.**     **Access Bio Makes An Extortionate Demand For A Release of Liability**

36.     When Intrivo confronted Access Bio about its willful breaches of the Supply Contract and License Agreement, Access Bio resorted to the same strong-arm tactics it had used to force a renegotiation of the parties' business relationship last summer. In advance of a meeting with Intrivo scheduled for January 4, 2022, Access Bio informed Intrivo that "[i]n order for us to continue to do business with Intrivo, any liability that may have arisen in connection with the shortfall amount must be released." Access Bio further insisted that Intrivo agree to reduce Access Bio's delivery obligations going forward, so that Access Bio would be free to devote most of its production capacity to its own CareStart OTC Tests, and to limit the circumstances under which license fees would be due.

37.     On January 13, 2022, Access Bio presented Intrivo with an ultimatum: Unless Intrivo accepted its demands by 5 p.m. the following day, Access Bio would cease producing On/Go Tests, thereby destroying Intrivo's business and leaving millions of individuals in California and across the country without ready access to the rapid COVID-19 tests needed to curb the pandemic and avoid unnecessary illness, hospitalizations, and deaths.

## FIRST CLAIM FOR RELIEF

### Breach of Contract – Supply Contract

38.     Intrivo incorporates by reference the allegations set forth in paragraphs 1 through 37 as if fully set forth herein.

39.     The Supply Contract is a valid and enforceable agreement between Intrivo and Access Bio.

40.     Intrivo has done all, or substantially all, of the significant things that the Supply Contract required, except to the extent such obligations have been waived or excused.

41.     Access Bio has materially breached the Supply Contract by failing to satisfy the specified minimum guarantees for October, November, and December 2021 and by failing to dedicate at least 65% of its production capacity for antigen tests to production of the On/Go Tests.

42.     As a direct and proximate result of Access Bio's breaches of the Supply Contract, Intrivo has suffered damages in an amount to be proven at trial.

43.     Intrivo has also suffered and continues to suffer irreparable harm as a result of Access Bio's breaches of the Supply Contract and, in particular, its diversion of production resources from the On/Go Tests to Access Bio's own CareStart OTC Tests. Intrivo has no adequate remedy at law and is entitled to preliminary and permanent injunctive relief to enforce Access Bio's obligations under the Supply Contract.

## SECOND CLAIM FOR RELIEF

### Breach of Contract – License Agreement

44.     Intrivo incorporates by reference the allegations set forth in paragraphs 1 through 37 as if fully set forth herein.

45.     The License Agreement is a valid and enforceable agreement between Intrivo and Access Bio.

46.     Intrivo has done all, or substantially all, of the significant things that the License Agreement requires, except to the extent such obligations have been waived or excused.

47.     Access Bio has materially breached the License Agreement by failing to pay to Intrivo a license fee for each CareStart OTC Test distributed in the U.S.

48.     As a direct and proximate result of Access Bio's breaches of the License Agreement, Intrivo has suffered damages in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### Breach of Implied Covenant of Good Faith and Fair Dealing

49.     Intrivo incorporates by reference the allegations set forth in paragraphs 1 through 37 as if fully set forth herein.

50.     The Supply Contract and License Agreement are valid and enforceable agreements between Intrivo and Access Bio.

51.     Intrivo has done all, or substantially all, of the significant things that the Supply Contract and License Agreement require, except to the extent such obligations have been waived or excused.

52.     Access Bio has acted unfairly and in bad faith to prevent Intrivo from receiving the benefits under the Supply Contract and License Agreement, and thereby breached the covenant of good faith and fair dealing that is implied into those agreements.

53.     As a direct and proximate result of Access Bio's breaches of the implied covenant of good faith and fair dealing, Intrivo has suffered damages in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF

### Promissory Fraud

54.     Intrivo incorporates by reference the allegations set forth in paragraphs 1 through 37 as if fully set forth herein.

55.     Access Bio promised in the Supply Contract that it would satisfy the specified minimum guarantees for October, November, and December 2021 and that it would dedicate at least 65% of its production capacity for antigen tests to production of the On/Go Tests.

56.     Access Bio promised in the License Agreement that it would remit a license fee in connection with each CareStart OTC Test distributed in the U.S.

57.     Access Bio did not intend to perform the foregoing promises at the time it made them.

58.     Access Bio intended for Intrivo to rely, and Intrivo did rely, upon the foregoing promises in entering into the Supply Contract, the License Agreement, and the Payment Agreement and Amendment No. 2 to Supply and Distribution Agreement.

59.     As a direct and proximate result of its reliance on Access Bio's false promises, Intrivo has suffered damages in an amount to be proven at trial.

60.     Access Bio, at the direction of its Chairman, Young Choi, engaged in the wrongful acts described herein with oppression, fraud, and malice. Intrivo is therefore entitled to an award of exemplary or punitive damages pursuant to California Civil Code § 3294.

## FIFTH CLAIM FOR RELIEF

### Intentional Interference With Contractual Relations

61.     Intrivo incorporates by reference the allegations set forth in paragraphs 1 through 37 as if fully set forth herein.

62.     Intrivo entered into contracts with various government organizations and businesses, including but not limited to the California Department of Health and Human Services, the Vermont Department of Health, and Gopuff, for the sale and delivery of On/Go Tests.

63.     Access Bio knew of the foregoing contracts.

64.     Access Bio's conduct prevented performance or made performance of the foregoing contracts more difficult.

65.     Access Bio intended to disrupt the performance of the foregoing contracts or knew that such disruption was certain or substantially certain to occur.

66.     As a direct and proximate result of its reliance on Access Bio's interference with the foregoing contracts, Intrivo has suffered damages in an amount to be proven at trial.

67.     Access Bio, at the direction of its Chairman, Young Choi, engaged in the wrongful acts described herein with oppression, fraud, and malice. Intrivo is therefore entitled to an award of exemplary or punitive damages pursuant to California Civil Code § 3294.

## SIXTH CLAIM FOR RELIEF

### Intentional Interference With Prospective Economic Advantage

68.     Intrivo incorporates by reference the allegations set forth in paragraphs 1 through 37 as if fully set forth herein.

69.     Intrivo was in an economic relationship with various government organizations and businesses, including the California Department of Health and Human Services, the Vermont Department of Health, Gopuff, CVS Pharmacy, and Anthem, that probably would have resulted in an economic benefit to Intrivo.

70.     Access Bio knew of the foregoing relationships.

71.     Access Bio engaged in wrongful conduct by which it intended to disrupt the foregoing relationships or knew that such disruption was certain or substantially certain to occur.

72.     As a direct and proximate result of its reliance on Access Bio's wrongful conduct, the foregoing relationships were disrupted and Intrivo has suffered damages in an amount to be proven at trial.

73.    Access Bio, at the direction of its Chairman, Young Choi, engaged in the wrongful acts described herein with oppression, fraud, and malice. Intrivo is therefore entitled to an award of exemplary or punitive damages pursuant to California Civil Code § 3294.

### SEVENTH CLAIM FOR RELIEF

**Unlawful Business Practices**

74.    Intrivo incorporates by reference the allegations set forth in paragraphs 1 through 37 as if fully set forth herein.

75.    Access Bio's actions as alleged herein constitute unlawful business practices in violation of California Business and Professions Code § 17200, *et seq.*

76.    Intrivo is entitled to injunctive relief prohibiting Access Bio from continuing to engage in such unlawful business practices.

### PRAYER FOR RELIEF

WHEREFORE, Intrivo prays for judgment as follows:

a.    For a temporary restraining order enjoining Access Bio and its employees, agents, affiliates, and anyone acting on its behalf or in concert with it from using its antigen test production capacity to produce tests other than Intrivo's On/Go OTC test until Access Bio has satisfied its entire 53.6 million test minimum guarantee to Intrivo;

b.    For a preliminary injunction enjoining Access Bio and its employees, agents, affiliates, and anyone acting on its behalf or in concert with it from using its antigen test production capacity to produce tests other than Intrivo's On/Go OTC test until Access Bio has satisfied its entire 53.6 million test minimum guarantee to Intrivo;

c.    For a permanent injunction enjoining Access Bio and its employees, agents, affiliates, and anyone acting on its behalf or in concert with from dedicating less than 65% of its antigen test production capacity to produce tests other than Intrivo's On/Go OTC test for the four-year term of the Supply Agreement;

d.    For compensatory damages in an amount to be determined at trial, including prejudgment interest;

e.    For punitive damages;

1      f.      For costs of suit; and

2      g.      For such other and further relief as the Court deems just and proper.

3    Dated:  January 18, 2022                HUESTON HENNIGAN LLP

4

5                                    By:    _____

6                                           John C. Hueston
                                            Attorneys for Plaintiff
7                                           Intrivo Diagnostics, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **DEMAND FOR JURY TRIAL**

Intrivo hereby demands a trial by jury on all causes of action for which a trial by jury may be had.

Dated:  January 18, 2022                           HUESTON HENNIGAN LLP


By: _____
     John C. Hueston
     Attorneys for Plaintiff
     Intrivo Diagnostics, Inc.